## The People v. Henry Thomas.

The defendant in a criminal case is not entitled, under Act No. 125 of 1861, to be sworn as a witness on his own behalf, but only to make a statement to the court or jury without oath.

*Heard October 10th. Decided November 5th.*

On exceptions from Genesee Circuit.

The defendant being on trial for larceny, May 16, 1861, after the evidence had closed on the part of the prosecution, offered himself as a witness on his own behalf, to be sworn and to testify in the same manner as other witnesses. The Circuit Judge ruled that he was not entitled to be sworn, and to testify as a witness on his own behalf, and rejected him as such. The case now comes before the court on exception to this ruling.

*M. Wisner*, for defendant.

*C. Upson*, Attorney General, for the People.

MARTIN CH. J.:

The Legislature of 1861, by the passage of the Act, No. 125, amendatory of the law of evidence, evidently intended to render all parties (except as is therein excepted) competent witnesses in civil cases only. This is obvious from an examination of the law as it existed before such amendment, and of the amendatory act. As the law stood prior to the act of 1861, all persons could be witnesses except parties named in the record, or in whose behalf suit was prosecuted or defended, or the husband or wife of a party. A party could be made a witness only upon an affidavit being made and filed by the adversary party, that facts were within the knowledge of such party which could be proven by no other person. In no case could a party testify as a witness in his own behalf: he must have been called by his adversary. Under that statute

a person accused of crime could not, of course, have been compellable or allowable to testify upon his trial.

The act of 1861 removed all disability of parties, except as therein otherwise provided; and among other provisions contains the following: "Nothing in this act shall be construed as giving the right to compel a defendant in criminal cases to testify, but any such defendant shall be at liberty to make a statement to the court or jury, and may be cross examined upon any such statement." This provision it is clear has the effect to confine the operation of the act to civil cases, allowing the accused in criminal cases to make a statement or not at his option. The difficulty seems to have arisen from the use of the word "compel;" but had the Legislature designed to *allow* him to be a witness, although not compellable, very different language would have been employed from that found in the act, to express such an intention The act declares what he may do; and this declaration excludes the presumption that any other right was conferred. If the People can not compel him to testify, neither can he force his testimony upon them. Otherwise there would be no reciprocal rights, and the prisoner would possess the double advantage of offering his sworn or his unsworn statement at his option. The Legislature did not confer, nor intend to confer, upon a person accused of crime, a right superior to that given to parties in civil actions, either by allowing him to swear in his own behalf, while he is not compellable to swear at the call of the People, nor by giving him the additional right of making his statement without oath, if safety or caution suggested it. We are therefore of opinion that he can only make a statement, and that such statement can not be upon oath.

There was no error in the ruling of the Circuit Judge, and judgment should pass according to the verdict.

MANNING J. concurred.

CHRISTIANCY J. concurred in the result.

CAMPBELL J.:

The only question arising in this case is, whether a prisoner on trial can demand to be sworn on his own be-half, to give evidence in the cause.

The statute of 1861, which makes parties competent witnesses, and compellable as well as allowable to testify in the same manner as other witnesses, contains this pro-viso: "Nothing in this act shall be construed as giving the right to compel a defendant in criminal cases to testify, but any such defendant shall be at liberty to make a statement to the court or jury, and may be cross examined upon such statement." *Laws* 1861, *p.* 169.

Taking this statute alone, without reference to any extrinsic considerations, I think it would fairly be construed as authorizing the defendant to be sworn. And if we looked no further than our other statutes, the changes they have made in the common law rule would not lead to any other conclusion. They have announced it as our policy to make neither interest, nor suspicion or conviction of crime, any bar to the admission of witnesses, leaving it to the jury in each case to determine on the credibility of their testimony. If no such objection is to prevail, a prisoner at the bar, whose innocence must be presumed until disproved, is in no worse position of unfitness to testify than others, and such objections as may exist against his credibility are sufficiently apparent here as in other cases. My impressions have been, for these reasons, in favor of such a construction as will permit him to be sworn. But on reflection, and examination of the whole subject, I have come to a different conclusion; although the question is not to my mind entirely free from difficulty. The difficulty is increased by the fact that while the statute of 1861 is substantially borrowed from the English act of 14 and 15 Vic. c. 99, the section of that act referring to defendants in criminal cases is changed in

a very important and pertinent provison. By that act it is declared that "Nothing herein contained shall render any person who in any criminal proceeding is charged with the commission of any indictable offense, or any offense punishable on summary conviction, *competent or compellable* to give evidence for or against himself or herself, or shall render any person compellable to answer any question tending to criminate himself or herself, or shall in any criminal proceeding render any husband *competent or compellable* to give evidence for or against his wife, or any wife competent or compellable to give evidence for or against her husband." 1 *Phil. Ev. XV. (Ed. of 1860).* Our statute omits the provision that such testimony *shall not be competent*, and expressly permits a statement from the prisoner. This material discrepancy between the statutes introduces an element of difficulty of a serious nature, inasmuch as in all our innovations on the law of evidence, we have attempted in great measure to follow the English statutes, and adopt their language. And had not the terms used in our own statute referred to a practice the propriety of which has been a subject of consideration for many years, it would be difficult to show any very convincing reason why so plain a variation made in copying a statute should be disregarded or narrowed in its application.

There was, however, much force in the view presented, that the subject is one over which the Legislature has not complete control. The Constitution does not permit any man to be compelled in any criminal case to be a witness against himself:— *Const. of Mich. Art.* 6, § 32. This prohibition would undoubtedly apply as well to prevent questioning without oath as with. The French law, under which the questioning of the prisoner has been by some authorities likened to the "questioning" by torture, does not put him under oath. Under the law of England (under which our principle that no man should be com-

pelled to criminate himself originated) the witnesses for a defendant charged with felony were never sworn until the statute 1 *Anne*, § 2, c. 9, was enacted to permit it : — 2 *Hale P. C.* 283 ; 4 *Bl. Com.* 359, 360. And at one time he could not even introduce unsworn witnesses : — *Ibid*. But while it has been permitted in many cases to examine a prisoner without oath, so far as he was willing to answer, it has been adjudged that a confession or statement or examination under oath, even after a caution given to the prisoner that he need not criminate himself, must be regarded as made under undue influence, and excluded on that account. And this ruling was made under a statute expressly authorizing the *examination* of the accused : 1 *Hale P. C.* 585 ; *Rex v. Smith*, 1 *Stark. R.* 242 ; *Rex v. Webb*, 4 *C. & P.* 564 ; *Rex v. Lewis*, 6 *C. & P.* 161 ; *Rex v. Rivers*, 7 *C. & P.* 177 ; *Regina v. Pikesley*, 9 *C. & P.* 124. The statute must have meant one thing or the other, and not both. It must have contemplated nothing but a sworn statement, or nothing but an unsworn statement in all cases. The view of the English judges that an oath, even where a party is informed he need answer no questions unless he pleases, would with most persons overcome that caution, is I think founded on good reason and experience. I think there is no country, certainly there is none from which any of our legal notions are borrowed, where a prisoner is ever examined on oath. And, inasmuch as unsworn examinations and statements are not unfamiliar in criminal jurisprudence, we are bound in view of this to inquire whether the statute cannot be carried out more literally, as well as more naturally, by applying its language to statements not under oath.

Although no statute has yet, so far as I am aware, changed the old rules of practice in England, it is well known that for many years it has been debated there whether some provision should not be made, whereby a prisoner's version of facts might be got at, so as to elicit

the truth on a trial. Some persons have advocated the entire removal of his privileges as well as disabilities. These views, however, have met little favor. But the question how far an advance could be made without violating the wholesome rule which shields him from any obligation to criminate himself, has attracted attention in Parliament as well as out of it. I have not been able to find any report of the parliamentary investigation, but in an able article on Scottish Criminal Law, published in the North British Review (*Vol.* 4 *p.* 312), allusion is made to it, and a suggestion is thrown out that a statement of facts by a prisoner, made voluntarily, as far as he should see fit to explain them, and concerning which he might be cross examined by questions confined strictly to the matters he narrates, would steer clear of the difficulties and injustice attending the Scottish and French practice, and materially aid the jury in arriving at the truth; where, without such an opportunity, the prisoner might be unjustly condemned on false appearances. There is also an Essay on Criminal Procedure in England and Scotland in the Edinburgh Review of October, 1858 (*No.* 220), in which an examination is had of the Scottish, English and French systems, making a somewhat similar suggestion, and criticising with some severity the modes of interrogation employed in Scotland and France. The latter is characterized by Lord Brougham, as "*the torture and question which the prisoner is put to on his trial by the Judge:*" — *Ibid.* 185. But while condemning this system, his lordship intimated clearly his views that a change in the English law was necessary. In France, it appears that the prisoner is questioned by the Judge before any witnesses are examined, and is not during such questioning allowed any aid of counsel, although he may decline answering if he pleases. The reports of criminal trials which we occasionally meet, fully bear out the character which Lord Brougham has given to their judicial questioning.

Under the Scottish system, the prisoner is questioned on a preliminary examination, which is, if not often abused, at least very liable to be carried too far; and on the trial this examination is read to the jury, and if the accused declines answering any question, *it is written down*, and his response or his refusal is given in full. In the great Stirling forgery case, reported in Townsend's Modern State Trials, it appears that the defendant was subjected to no less than three examinations, besides one had before the Lords of Session in a civil suit in which the same ground was covered, which were all recorded and used on the criminal trial. *This proceeding is said by* Mr. Swinton to have been an unusual one. See *Warren's Miscellanies, p.* 353–4 (*Blackwood's Ed.*) But it seems nevertheless to have been legal.

It is very manifest that such proceedings are quite as much in violation of the spirit of the constitutional maxim as if the defendant were examined on oath. That maxim was the result of an experience which showed that in the hands of tyrannical prosecutors and courts, less governed by public opinion than in modern times, it was no difficult matter to wrest innocent admissions and statements to purposes of condemnation. According to the theory of the law, both courts and prosecutors are now regarded as bound to see that a defendant be not unjustly convicted:—*Regina v. Thursfield*, 8 *C. & P.* 269. But every one familiar with courts knows that, with the best intentions, it is very difficult, when interrogating a person, to abstain from pressing him further than such a theory would strictly warrant, and with that "increasing energy" which is enjoined by the Austrian Code, where prisoners do not answer readily:—*Sandford's Penal Codes*, 366. And if we were to hold that a prisoner offering to make a statement must be sworn in the cause as a witness, it would be difficult to protect his constitutional rights in spite of every caution, and would often lay innocent par-

ties under unjust suspicion where they were honestly silent, and embarrassed and overwhelmed by the shame of a false accusation. But perhaps the worst evil would be the degradation of our criminal jurisprudence by converting it into an inquisitory system, from which we have thus far been happily delivered. Doubtless our system may be improved, but hitherto it has been at least as favorable as any other for the purpose of punishing guilt without oppressing innocence.

I think the statute of 1861, when it permits a statement to be made, is best reconciled with the Constitution by construing such statement to be a narrative of such facts as a prisoner may see fit to state. A cross examination on such a statement would not, therefore, be allowed to go beyond it. It could not properly extend over the entire issue, as it might if he were a general witness, neither could it go into any of the collateral inquiries whereby a witness' credit or memory is sometimes tested. And while his constitutional right of declining to answer questions can not be removed, yet a refusal by a party to answer any fair question not going outside of what he has offered to explain, would have its proper weight with the jury.

The use of such a statement is pointed out by those who have discussed this subject, and it is by no means trifling. It is a settled maxim in criminal law, that no one should be convicted unless the testimony taken together is not fairly consistent with any theory but guilt. There are many cases where convictions are had in which it is extremely difficult to say whether there was not room for a reasonable doubt, and many more where suspicious facts are susceptible of explanation were evidence attainable. If a prisoner makes a statement which is consistent as well as apparently sincere, it may often remove those doubts. A jury is not bound to believe all that every prisoner says, any more than all that each witness says.

Common sense must be applied here as elsewhere. It is not often, however, that a person can make a false statement in detail, which will bear the test of cross-examination and comparison with the proofs. And if a jury is satisfied that a prisoner's account is so probable and consistent as to remove the difficulties in the cause, it would be absurd as well as unjust to reject it because not sworn to. Originally, as we have seen, the prisoner's witnesses were not sworn, and had this been held a fatal objection to their credibility, judicial proceedings would have been but a mockery.

Instead of being a dangerous innovation, I think there is much reason to regard the statement of a prisoner, made in the way suggested, as by no means a novelty in our law.

In *Regina v. Malings*, 8 *C. & P.* 242, a prisoner was indicted for having maliciously wounded one Benjamin Churchill, with intent to do him some grievous bodily harm. Churchill made out a case, and no other person was cognizant of the facts, as he was alone with prisoner when the assault took place. Alderson B. permitted the prisoner to make a statement to the jury before his counsel addressed them, and they were satisfied with his explanation, and found him guilty of a simple assault only. In allowing this, the judge expressed his opinion of the justice of permitting a prisoner to make such a statement, and remarked that in cases of high treason it was always allowed. It is to be observed also that the only ground of objection raised was that the prisoner had counsel, and should leave all his case in their hands. In *Regina v. Walkling*, 8 *C. & P.* 243, the prisoner, although having counsel, was permitted on the authority of Maling's case, to read a written statement; but it was said by Gurney B. that it should not be drawn into a precedent. In *Regina v. Boucher*, 8 *C. & P.* 141, and *Regina v. Beard*, 8 *C. & P.* 142, it had been held that a prisoner who had

counsel could not himself address the jury in ordinary cases. In *Rex v. Parkins*, *Ry. & M.* 166, it was held that a defendant on trial for misdemeanor could not have the aid of counsel to argue any but law points, if he reserved the right to address the jury himself. See also *Rex v. White*, 3 *Camp.* 98. Until 1837 (by act of 6 and 7 W. 4, c. 114) prisoners indicted for felony were not entitled to full defense by counsel; and the rules found in 7 *C. & P.* 676 for governing the practice in such cases show that the previous practice had in many respects been more liberal in favor of prisoners.

The objections in the cases cited were all based on the fact that the prisoner had counsel to address the jury. How far prisoners had been permitted to go previously, is not to be ascertained from the books of practice; but from the remarks of Alderson B. in Regina v. Malings, it is evident much latitude was allowed. The State Trials show the same thing. And in the modern case of *Regina v. Frost*, for treason, the prisoner was allowed to address the jury after his counsel had done so, but waived his right to do it. There could be no object in such a practice, except to allow him to tell his own story. See 1 *Townsend's Mod. St. Tr. p.* 71. The case is also reported on the law points in 9 *C. & P.* 129.

I think the statements contemplated by our statute are such as were allowed in *Regina v. Malings* and *Regina v. Walkling*, and are such unsworn statements as the prisoner may choose to make; and that the design of the law is to secure that as an absolute right which formerly was a matter of discretion, and granted only in special cases, when a prisoner was defended by counsel; but when not so defended, allowed generally. By allowing these I think the terms of the statute are fully complied with, and a practice is introduced whereby, if fairly carried out, the prisoner may often be enabled to clear up false charges and remove doubts against him. And it seems on the

whole to be less in conflict with other important pro-
visions of law, and especially] less obnoxious to the spirit
of the constitutional provision, than allowing the prisoner
to be sworn.

I am therefore in favor of allowing judgment on the
verdict.